UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
KANIKA TROWER,

                    Plaintiff,                    16-cv-4322 (PKC)

        -against-                        OPINION
                                              AND ORDER

MOUNT SINAI HOSPITAL, VADESA
GUZMAN and NISHA SULLIVAN,

                    Defendants.
------------------------------------------------------------x

CASTEL, U.S.D.J.

        From April 2013 to November 2015, plaintiff Kanika Trower was employed by

defendant Mount Sinai Hospital ("Mount Sinai," or the "Hospital"), where her responsibilities

mainly entailed helping new patients register with the Hospital.  Trower asserts that during her

employment, she was discriminated against on account of her race by her immediate supervisor,

defendant Vadesa Guzman, and her department's administrative manager, defendant Nisha

Sullivan.  In June 2015, Trower filed a complaint of racial discrimination with the Equal

Employment Opportunity Commission (the "EEOC").

        Shortly thereafter, Trower went on disability leave due to anxiety and depression.

She filed a charge of disability discrimination with the EEOC in August 2015.  Trower was

terminated on November 2, 2015, based on what defendants have described as a

misunderstanding about the status of documentation that was required to substantiate her

disability.  The next month, in December 2015, Trower's documentation was located in Hospital

files, and she was immediately reinstated.  Following reinstatement, she did not return to work at

Mount Sinai, and began employment at Bronx Lebanon Hospital in April 2016.

Trower asserts that Mount Sinai terminated her on the basis of her race and disability, and that she was also terminated for retaliatory reasons. Trower also asserts that she was subjected to a hostile work environment. She brings claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101, et seq. (the "ADA") and the New York City Human Rights Law ("NYCHRL").

Discovery in this case is closed, and defendants have moved for summary judgment in their favor. For the reasons that will be explained, the defendants' motion for summary judgment is granted as to Trower's claims of racial discrimination, hostile work environment and retaliation for complaints about racial discrimination. However, because Trower has come forward with evidence from which a reasonable trier of fact could find discriminatory and retaliatory intent related to disability, defendants' motion is denied as to her claims of discrimination and retaliation under the ADA and NYCHRL.

BACKGROUND.

A. Trower's Disciplinary History and Her Interactions with Supervisors.

In April 2013, Mount Sinai hired Trower to work as a registrar, a job that required her to complete the registration process for arriving patients. (Def. 56.1 ¶¶ 1-2; Pl. 56.1 Resp. ¶¶ 1-2.) Trower identifies as African American. During the time of Trower's employment, defendant Vadesa Guzman was her immediate supervisor, and defendant Nisha Sullivan was the department's administrative manager, with direct supervisory authority over Guzman. (Def. 56.1 ¶ 4; Pl. 56.1 Resp. ¶ 4.) Guzman identifies as Hispanic, and Sullivan identifies as African American. (Def. 56.1 ¶ 5; Pl. 56.1 Resp. ¶ 5; Pl. 56.1 ¶ 81; Def. 56.1 Resp. ¶ 81.)

Beginning in February 2014, Trower received a series of disciplinary warnings, and was required to attend documented conferences related to certain issues that arose in the workplace. On February 12, 2014, she received a warning for failure to verify certain patient information, and for four occasions where she failed to call insurers during patient registration. (Def. 56.1 ¶ 8; Pl. 56.1 ¶ 8.) Defendants assert that Trower received a second warning on March 14, 2014, this time for failing to obtain patient authorizations; Trower disputes that she received this warning. (Def. 56.1 ¶ 10; Pl. 56.1 ¶ 10.) On April 8, 2014, Trower attended a documented conference with a supervisor for violating the departmental dress code. (Def. 56.1 ¶ 11; Pl. 56.1 ¶ 11.) On September 9, 2014, Trower received a warning for entering incorrect information concerning two referring physicians, which caused those physicians not to receive patient reports. (Def. 56.1 ¶¶ 13-14; Pl. 56.1 Resp. ¶¶ 13-14.) On February 10, 2015, Trower attended a documented conference to address her purported failure to inform a coordinator that she would be away from the front desk, and for addressing the coordinator "inappropriately." (Def. 56.1 ¶ 15; Pl. 56.1 Resp. ¶ 15.) On March 3 and March 24, 2015, Trower attended documented conferences related to inaccuracies that she entered as to certain patients. (Def. 56.1 ¶ 16; Pl. 56.1 Resp. ¶ 16.) On May 1, 2015, Trower argued in front of patients with a co-worker, Jerrilyn Torres, over a bag of chips; Trower asserts that she did not behave inappropriately and that Torres was the aggressor. (Def. 56.1 ¶ 17; Pl. 56.1 Resp. ¶ 17.) As a result of the incident, both Trower and Torres received "Final Warnings." (Def. 56.1 ¶ 19; Pl. 56.1 Resp. ¶ 19.)

After May 19, 2015, Trower received a second "Final Warning" and a five-day suspension, as a result of an incident in which defendant Guzman concluded that Trower had not shown up for work and had not informed Guzman of her absence. (Def. 56.1 ¶¶ 20-24; Pl. 56.1

- 3 -

Resp. ¶¶ 20-24.)  Trower maintains that she informed Guzman of her absence.  (Pl. 56.1 Resp. ¶ 20.)

Trower then wrote to officials of 1199SEIU United Healthcare Workers East (the "Union"), the union of which she was a member, and complained about her purported mistreatment.  (Def. 56.1 ¶¶ 3, 25-26; Pl. 56.1 Resp. ¶¶ 3, 25-26.)  Tyrome Bell, the Union's organizer, met with Clarissa Jones-Winter, the director of labor relations at Mount Sinai, and the two discussed Trower's disciplinary history and conflicts with Guzman.  (Def. 56.1 ¶¶ 28-29; Pl. 56.1 Resp. ¶¶ 28-29.)  Trower and Jones-Winter then had a meeting, in which Trower requested a transfer to a different department; Jones-Winter put Trower in touch with an internal Mount Sinai job recruiter, and arranged for other administrators to speak with Guzman.  (Def. 56.1 ¶¶ 30-36; Pl. 56.1 Resp. ¶¶ 30-36.)

Trower asserts that she was discriminated against as an African American person who does not speak Spanish.  According to Trower, Guzman referred to her as "you people," and stated that Trower was not like the Hospital's other registrars.  (Pl. 56.1 Resp. ¶¶ 60, 61.)  Trower states that Guzman made comments about Trower's father being of Venezuelan descent.  (Pl. 56.1 Resp. ¶ 61.)  Trower also states that Guzman called her "young lady," "incompetent" and "slow," told her that she was "not like the rest of the girls here," that "nobody in the Department liked" her, "you don't listen," and "I don't get you people."  (Def. 56.1 ¶¶ 64-65, 67; Pl. 56.1 Resp. ¶¶ 64-65, 67.)

Trower asserts that defendant Sullivan commented about Trower's race, including the observation that "it was hard for [Trower] being a black African American minority working amongst Hispanics," and repeating the phrase "beautiful niggra" on one occasion after Trower described an incident in which a patient called her a "beautiful niggra."  (Def. 56.1 ¶ 68; Pl. 56.1

Resp. ¶ 68.)  Like Trower, Sullivan identifies as African American.  (Def. 56.1 ¶ 5; Pl. 56.1 Resp. ¶ 5.)  Two co-workers jokingly repeated the phrase "beautiful niggra" in reference to Trower.  (Def. 56.1 ¶ 68; Pl. 56.1 Resp. ¶ 68.)

On June 10, 2015, Trower filed a charge of discrimination with the EEOC, asserting that Mount Sinai had discriminated against her on the basis of race.  (Pl. 56.1 ¶ 116; Def. 56.1 Resp. ¶ 116.)

### B.  Trower's Disability Leave in 2015, Her Ensuing Termination and the Termination's Rescission.

In summer 2015, Trower went on short-term disability leave.  (Def. 56.1 ¶ 37; Pl. 56.1 Resp. ¶ 37.)  She provided doctor's notes with return-to-work dates of July 10, September 7 and October 5, respectively, and all requests for leave were granted.  (Def. 56.1 ¶¶ 38-40; Pl. 56.1 Resp. ¶¶ 38-40.)  On August 21, 2015, Trower filed an amended charge with the EEOC that asserted disability discrimination.  (Pl. 56.1 ¶ 116; Def. 56.1 Resp. ¶ 116.)

While Trower was on disability leave, Sullivan and Jones-Winter had an e-mail exchange that concerned Trower's ongoing employment status.  On August 11, 2015, Jones-Winter e-mailed Sullivan stating that Trower had extended her leave to September 7, 2015.  (Pl. 56.1 ¶ 128; Def. 56.1 Resp. ¶ 128.)  Sullivan replied, "How long do I have to keep this position for her?  We are extremely short staffed and this ongoing short term disability is impacting our patient through put."  (Pl. 56.1 ¶ 128; Def. 56.1 Resp. ¶ 128; Schwartz Dec. Ex. C.)  Jones-Winter replied, "Is she at termination point now?  If so, let's write her up and move forward."  (Schwartz Dec. Ex. C.)  Sullivan replied, "Do we have enough to do so or will this be retracted and I'll have to rehire her?"  (Id.)  In her deposition, Sullivan testified that at the time Trower began her disability leave, there had been no plan to terminate her, and that her questions to

Jones-Winter went toward whether Trower's disciplinary record warranted termination. (Schwartz Dec. Ex. C. at 91-92.)

Sullivan also testified that because Trower was out on leave, Sullivan wanted Trower to be terminated so that she could hire someone else. Trower testified that she "needed the position. I needed a body to fill the position." (Schwartz Dec. Ex. C at 87.) Counsel asked, "And since Ms. Trower was out on leave, you needed to terminate her to hire somebody else?", to which Sullivan answered, "That's correct." (Id. at 87-88.)

Trower did not return to work on the scheduled date of October 5, at which point, Jones-Winter e-mailed Bell stating that Trower had not shown up for work and inquiring whether Bell knew of her status; Bell answered that he did not know. (Def. 56.1 ¶¶ 41-43; Pl. 56.1 Resp. ¶¶ 41-43.) On October 23, 2015, Sullivan wrote to Trower stating that if she did not provide medical documentation by November 2, 2015, she would be terminated. (Def. 56.1 ¶ 44; Pl. 56.1 Resp. ¶ 44.) Sullivan did not receive a response, and Trower was terminated, effective November 2, 2015. (Def. 56.1 ¶ 45; Pl. 56.1 Resp. ¶ 45.) Trower maintains that she sent all medical documents to Mount Sinai's labor relations department. (Def. 56.1 ¶ 46; Pl. 56.1 Resp. ¶¶ 45-46.)

Jones-Winter then reviewed documents in the labor relations department, and found doctors' notes on behalf of Trower extending her leave to November 30, 2015, and then to March 7, 2016. (Def. 56.1 ¶ 48; Pl. 56.1 Resp. ¶ 48.) She immediately rescinded Trower's termination, and the Union informed Trower of the rescission. (Def. 56.1 ¶¶ 49-50; Pl. 56.1 Resp. ¶¶ 49-50.)

With her employment status restored, Trower continued to look for positions in other departments at Mount Sinai, but changes in the hospital's information technology system

and confusion over her status left her unable to log into the job-posting system. (Def. 56.1 ¶¶ 51-58; Pl. 56.1 Resp. ¶¶ 51-58.) Jones-Winter attempted to fix the issue, but by the time it was resolved, Trower had begun employment at Bronx Lebanon Hospital. (Def. 56.1 ¶¶ 56, 59; Pl. 56.1 Resp. ¶¶ 56, 59.)

SUMMARY JUDGMENT STANDARD.

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. A fact is material if it "might affect the outcome of the suit under the governing law. . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party and resolve all ambiguities and draw all reasonable inferences against the movant." Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014) (quotation marks omitted).

It is the initial burden of the movant to come forward with evidence on each material element of his claim or defense, demonstrating that he is entitled to relief, and the evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law. Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 248).

In employment discrimination suits where the "merits turn on a dispute as to the employer's intent," courts exercise caution in granting summary judgment motions. <u>Holcomb v. Iona College</u>, 521 F.3d 130, 137 (2d Cir. 2008). Nonetheless, when a discrimination case lacks a genuine issue of material fact, summary judgment remains available. <u>Schiano v. Quality Payroll Sys., Inc.</u>, 445 F.3d 597, 603 (2d Cir. 2006). Court "should examine the record as a whole" to determine whether a jury could reasonably find a discriminatory purpose by the employer. <u>Walsh v. N.Y. City Housing Auth.</u>, 828 F.3d 70, 76 (2d Cir. 2016). "No one piece of evidence need be sufficient, standing alone, to permit a rational finder of fact to infer that defendant's employment decision was more likely than not motivated in part by discrimination." <u>Id.</u>

DISCUSSION.

I.      Defendants' Motion Is Granted as to Trower's Claims of Discrimination Based on <u>Race.</u>

Count One of Trower's complaint alleges that Mount Sinai violated Title VII by discriminating against her because she is African American. Count Five alleges that all defendants violated the NYCHRL's prohibition against workplace discrimination.

Because Trower has not come forward with evidence that would permit a reasonable trier of fact to conclude that her termination was motivated by racial animus, the defendants' summary motion is granted as to these claims.

A.  <u>Summary Judgment Is Granted as to Trower's Title VII Claim.</u>

Trower's Title VII claim of discrimination is governed by the burden-shifting analysis established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04 (1973). <u>See Tolbert v. Smith</u>, 790 F.3d 427, 434 (2d Cir. 2015). "Under the <u>McDonnell Douglas</u> framework, [Trower] bears the burden of establishing a prima facie case of discrimination by showing (1) [she] belonged to a protected class; (2) [she] was qualified for the position [she] held; (3) [she]

suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." Id. at 435 (quotation marks omitted). If a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for termination. Patterson v. Cnty. of Oneida, 375 F.3d 206, 221 (2d Cir. 2004). If the employer satisfies this burden, the burden then shifts back to the plaintiff to demonstrate that the non-discriminatory reasons proffered by the employer were pretextual. Id.

For the purposes of this motion, there is no dispute that Trower was qualified for her position and that she was subjected to an adverse employment action. However, defendants argue that Trower cannot show that she brings her claim as a member of a protected class, or that her termination occurred under circumstances that give rise to an inference of discriminatory intent.

Individual defendants with only supervisory control may not be subject to liability under Title VII. Patterson, 375 F.3d at 221. The Court separately considers her claims of racial discrimination under Title VII and the NYCHRL.

1. Trower's Status as a Non-Spanish Language Speaker Does Not Place Her within a Protected Class.

There is no dispute that, as an African American, Trower is a member of a protected class. According to defendants, however, the gravamen of Trower's claim is that she began to suffer discrimination after Guzman learned that Trower did not speak Spanish. Defendants point to the following testimony in Trower's deposition:

> Q. Is there any other reason that you believe Ms. Guzman discriminated against you because of race, other than the fact that you didn't speak Spanish?
>
> A. No.

(Trower Dep. at 40.)

A claim that a plaintiff suffered discrimination solely on the basis of language abilities does not establish membership in a protected class.  See Soberal-Perez v. Heckler, 717 F.2d 36, 41 (2d Cir. 1983) ("Language, by itself, does not identify members of a suspect class."); accord Brailsford v. Zara USA, Inc., 2016 WL 626560, at *3 (S.D.N.Y. Feb. 16, 2016) (concluding that plaintiff was a member of a protected class as an African American, but not as a non-Spanish speaker) (Schofield, J.); Brewster v. City of Poughkeepsie, 447 F. Supp. 2d 342, 351 (S.D.N.Y. 2006) ("Title VII makes it unlawful for an employer to discriminate against an individual on the basis of, inter alia, his or her race or national origin.  It does not protect against discrimination on the basis of language.") (McMahon, J.).

To the extent that Trower purports to be a member of a protected class as a non-Spanish speaker, her language status does not make out a prima facie case that she belongs to a protected class.  However, given that it is undisputed that Trower is African American and that her status as an African American places her within a protected class, there is sufficient evidence for a reasonable juror to conclude that she satisfies the first prong of McDonnel Douglas.

Defendants' motion is therefore granted to the extent that Trower asserts protected status as a non-Spanish speaker, but denied to the extent that she asserts protected status as an African American.

> 2. Trower Has Not Come Forward with Evidence that Would Permit a Reasonable Juror to Conclude that Her Termination Was Motivated by Racial Discrimination.

Defendants separately argue that summary judgment should be granted as to Trower's claims of race discrimination because there is no evidence showing that she suffered an adverse employment action as a result of discriminatory animus.  They point to a variety of facts

that, they urge, show that no reasonable trier of fact could conclude that Trower was discriminated against because she is African American.

"It is well-settled that an inference of discriminatory intent may be derived from a variety of circumstances, including, but not limited to: 'the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" Leibowitz v. Cornell Univ., 584 F.3d 487, 502 (2d Cir. 2009) (quoting Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994)).

As noted, in reviewing a motion for summary judgment the Second Circuit has directed courts to "examine the entire record to determine whether the plaintiff could satisfy [her] ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." Walsh, 828 F.3d at 76. "No one piece of evidence need be sufficient, standing alone, to permit a rational finder of fact to infer that defendant's employment decision was more likely than not motivated in part by discrimination." Id. Courts deciding a summary judgment motion must not take a "piecemeal approach" to evidence of discrimination. Id. at 77. Evidence that would not tend to show discrimination if viewed in isolation may be "one component" in a "cumulative inquiry" ultimately weighed by a finder of fact. Id. at 77-78. "[I]t [is] error to require a single piece of evidence to bear the full weight of [plaintiff's] burden." Id. at 78. However, "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." Tomassi v. Insignia Fin. Grp., Inc., 478 F.3d 111, 115 (2d Cir. 2007).

Because evidence tending to establish discrimination must be considered cumulatively and not in a piecemeal fashion, the Court reviews the evidence of discrimination contained in the summary judgment record, and then considers whether, cumulatively, a reasonable trier of fact could conclude that Trower was terminated on grounds of racial discrimination.

First, defendants observe that Trower was not the only African American registrar employed by the Hospital, and that between Trower's hiring in April 2013 and her termination in November 2015, Mount Sinai hired six additional registrars, one of whom was African American.

Second, they argue that Guzman's allegedly discriminatory comments were race neutral. Guzman purportedly referred to Trower as "young lady," "incompetent," "slow" and "not like the rest of the girls here." Trower also asserts that Guzman told her, "I don't get you people." Where a plaintiff's sole evidence of discriminatory animus turns on facially neutral remarks, those neutral remarks are insufficient to support a claim of discriminatory motivation. See, e.g., Wright v. Jewish Child Care Ass'n of NY, 68 F. Supp. 3d 520, 526-27 (S.D.N.Y. 2014) (statements that plaintiff was not "suitable" and did not "fit" the program were insufficient evidence of discriminatory animus) (Buchwald, J.). Additionally, the phrase "you people" is generally not sufficient to show discriminatory motivation, absent additional context suggesting that the speaker was referring to the plaintiff's race. Atkins v. Pitney Bowes Mgt. Servs., 2015 WL 144158, at *5 (S.D.N.Y. Jan. 12, 2015) (Koeltl, J.).

Third, defendants argue that any statements concerning Trower's race do not support an inference of discriminatory animus. This includes Sullivan's statement that it "was hard for [Trower] being a black African minority working amongst Hispanics," Sullivan's use of

the phrase "beautiful niggra" after Trower told her about a patient's use of the phrase, and two

co-workers' joking use of the phrase "beautiful niggra."  In deciding whether a remark is

relevant evidence of discrimination, courts consider the role of the speaker in the workplace, the

relationship of the remark to a disputed employment decision, whether a reasonable juror would

consider the remark discriminatory and the context of the remark within the employer's decision-

making process.  Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 149 (2d Cir. 2010).  Stray or

sporadic comments, standing alone, will not support an inference of discrimination.  See, e.g.,

Lugo v. Le Pain Quotidien, 2015 WL 1808558, at *5 (S.D.N.Y. Apr. 13, 2015).  In Lugo, the

plaintiff alleged that he was subject to discrimination on the basis of race, national origin and

age.  Id. at *4.  The evidence of animus was limited to a question about the plaintiff's national

origin during a meeting, and joking references to the plaintiff as an "old man," which the

plaintiff testified that he did not find offensive.  Id. at *5.  Judge Furman concluded that these

statements were not sufficient to support a claim of discriminatory motivation on the part of the

employer.  Id. at *5.

        Fourth, defendants note that Hispanic employees were disciplined for conduct that

was similar to Trower's.  This included twelve written warnings and seventeen documented

conferences with nine Hispanic employees for conduct that included registration errors,

absences, behavioral issues and dress code violations, all issued by defendant Guzman.

(Guzman Dec. ¶ 3 & Exs. 1-9.)  One of those employees was terminated.  (Guzman Dec. ¶ 3.)

Evidence that employees outside of a plaintiff's protected class received similar treatment may

be probative of whether defendants' actions were motivated by discriminatory animus.  See Cai

v. Wyeth Pharms., Inc., 2012 WL 933668, at *8 (S.D.N.Y. Mar. 19, 2012) (application of

allegedly discriminatory policy to employees ranging in age from 23 to 60 weighed against

inference of age discrimination) (Daniels, J.); <u>Ben-Levy v. Bloomberg, L.P.</u>, 2012 WL 2477685, at *7 (S.D.N.Y. June 26, 2012) (application of allegedly discriminatory policy to employees younger than 40 weighed against inference of age discrimination) (Forrest, J.).

Fifth, plaintiffs note that Sullivan, the administrative manager of Trower's department, identifies as African American, as does Trower. Non-party Jones-Winter also identifies as African American. (Def. 56.1 ¶ 22; Pl. 56.1 Resp. ¶ 22.) Where an individual alleged to have acted in a discriminatory fashion is a member of the same protected class as the plaintiff, that fact can be non-dispositive evidence weighing against an inference of discriminatory animus. <u>See</u>, <u>e.g.</u>, <u>White v. Pacifica Foundation</u>, 973 F. Supp. 2d 363, 380 (S.D.N.Y. 2013) (though not a "conclusive presumption," a supervisor's membership in plaintiff's protected class tends to "undermine[]" the inference of discriminatory animus) (Gardephe, J.); <u>Tucker v. New York City</u>, 2008 WL 4450271, at *5 (S.D.N.Y. Sept. 30, 2008) ("[A]ny inference of race discrimination is further undermined by the fact that all three superintendents under whom Tucker worked as well as three of his four direct supervisors at the DOE were also African-American.") (Lynch, J.).

In opposition to defendants' motion, Trower states that during her job interview, Guzman asked where her parents came from, and that when Trower answered Venezuela, Guzman appeared happy and stated that the country has "beautiful people." (Pl. 56.1 ¶ 80.) Later, when Guzman learned that Trower could not speak Spanish, Guzman replied that because her father is Venezuelan, Trower should speak the language. (Pl. 56.1 ¶ 88.) Guzman then began addressing Trower as "young lady," describing it as a cultural term. (Pl. 56.1 ¶¶ 90, 98.)

Trower notes that Sullivan referred to her as a "beautiful niggra," and states that when she complained to Sullivan about Guzman's treatment, Sullivan referred to Trower as not

being Hispanic.  (Pl. 56.1 ¶ 96, 104-05, 108.)  Trower asserts that nearly all of her co-workers were of Hispanic descent, and that Guzman stated that Trower was different from her co-workers.  (Pl. 56.1 ¶ 94.)  She also asserts that Guzman disciplined her for "nonsensical and bogus" reasons, and for conduct that she did not address when undertaken by her Hispanic colleagues.  (Opp. Mem. at 6.)

Viewing the evidence in its full context, and drawing every reasonable inference in favor of Trower as the non-movant, the Court concludes that no reasonable trier of fact could find that the Hospital's termination of Trower was racially motivated.  Trower relies principally on the neutral comments uttered by Guzman.  While insulting but neutral comments can be some evidence of discriminatory intent if the surrounding circumstances support an inference of racial animus, the record here does not support a finding of such animus.

The only comments related to Trower's race were Sullivan's use of the term "beautiful niggra" or "beautiful negro," which apparently was repeated by two co-workers, and Sullivan's statement that it "was hard for [Trower] being a black African minority working amongst Hispanics."  The term "beautiful niggra" was uttered in the context of an elderly patient who apparently used the phrase in reference to Trower.  The context of Sullivan's remark about Trower's experience as a person of African American descent working among Hispanics is less clear, but it does not raise an inference of animus toward Trower.  Any inference of animus by Sullivan is also undermined by the fact that Sullivan, like Trower, identifies as African American.  See White, 973 F. Supp. 2d at 380.

Trower also has not come forward with evidence to support her assertion that she received disciplinary measures that differed from those placed on her co-workers, including Hispanic co-workers.  See, e.g., Opoku v. Brega, 2016 WL 5720807, at *8 (S.D.N.Y. Sept. 30,

2016) (plaintiff asserting disparate disciplinary treatment must show that similarly situated employees outside the relevant protected group received better treatment).  Her assertion of different treatment is conclusory, vague and not supported by citations to the record.  By contrast, the Hospital has come forward with evidence that Hispanic employees were disciplined in a similar manner as Trower, for participating in similar conduct.  (Guzman Dec. ¶ 3 & Exs. 1-9.)

In addition, the timing of Trower's termination related to her ongoing medical leave and the decision makers' belief that Trower had not submitted necessary documentation related to medical leave.  The comments cited as evidence of racial discrimination were made prior to the series of events that resulted in Trower's termination, and were in the context of disciplinary measures taken by Guzman ad Sullivan.  Trower's evidence of racial discrimination is both temporally remote from the adverse employment action and outside the context of the Hospital's decision-making process leading to her termination, thus weighing further against an inference of discriminatory intent.

Because Trower has not come forward with evidence that would permit a reasonable juror to conclude that she was terminated because of her race, the defendants' summary judgment motion is granted, and her Title VII claim against the Hospital is dismissed.

B.  Summary Judgment Is Granted as to Trower's NYCHRL Claim of Racial Discrimination.

In addition to Trower's Title VII discrimination claim against the Hospital, she brings claims under the NYCHRL alleging that the Hospital, Guzman and Sullivan discriminated against her on the basis of race.  (Compl't ¶¶ 69-71.)

The First Department has concluded that in a motion for summary judgment, a discrimination claim under the NYCHRL should be reviewed pursuant to both "the McDonnell

Douglas framework and the somewhat different 'mixed motive' framework recognized in certain federal cases." Melman v. Montefiore Med. Ctr., 98 A.D.3d 107, 113 (1st Dep't 2012). Reviewing Melman and other New York authority, the Second Circuit concluded that the NYCHRL "simplified the discrimination inquiry: the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason. The employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes as a matter of law that discrimination played no role in its actions." Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 110 n.8 (2d Cir. 2013) (quotation marks omitted).

For the reasons explained, the Court concludes that no reasonable finder of fact could conclude that racial discrimination played a role in Trower's termination. As discussed, Trower's evidence in support of discriminatory motivation consists principally of demeaning but facially neutral statements uttered by Gomez. To the extent that Sullivan remarked on Trower's racial status, the comments did not reflect discriminatory animus, and were remote from the decision-making process that resulted in her termination. Trower also has not come forward with evidence to support her assertion that she was subjected to disciplinary measures that differed from those administered to other employees outside of her protected class.

Defendants' motion for summary judgment is therefore granted as to Trower's claims of racial discrimination under the NYCHRL.

II.     Defendants' Motion Is Granted as to Trower's Hostile Work Environment Claim.

Trower asserts that the Hospital violated Title VII by subjecting her to a hostile work environment. Drawing every reasonable inference in Trower's favor, no reasonable jury

could conclude that Trower was subject to a hostile work environment, and the defendants' summary judgment motion is therefore granted.

"To establish a prima facie case of hostile work environment, the plaintiff must show that the discriminatory harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and 'that a specific basis exists for imputing' the objectionable conduct to the employer.'" Tolbert v. Smith, 790 F.3d 427, 439 (2d Cir. 2015) (quoting Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997)). A hostile environment claim has both objective and subjective components: the conduct at issue must be so severe and pervasive that a reasonable person would find it hostile and abusive, and the plaintiff must subjectively perceive the environment as abusive. Littlejohn v. City of N.Y., 795 F.3d 297, 320-21 (2d Cir. 2015). Incidents "must be more than episodic," and must be "continuous and concerted." Tolbert, 790 F.3d at 439. Unless "isolated acts" are "very serious," they do not make out a showing of severity and pervasiveness amounting to a hostile work environment. Id. However, the use of racial slurs by a supervisor can "quickly alter the conditions of employment," especially if uttered "in a physically threatening manner." Rivera v. Rochester Genesee Regional Transp. Auth., 743 F.3d 11, 24 (2d Cir. 2014) (quotation marks omitted).

Based on the summary judgment record, no reasonable trier of fact could conclude that Trower was subjected to a hostile work environment. She points out that Guzman "would condescend and ridicule" her "constantly," including by calling her incompetent and threatening her job, which resulted in Trower suffering from "depression and anxiety." (Opp. Mem. at 7.) Trower also points to Sullivan's use of the term "beautiful niggra" after Trower complained about a patient's use of the term. (Id.) She states that when she complained to

Sullivan about Guzman, Sullivan replied that Sullivan had taken "a white, red-headed, troll-looking bitch's job," an assertion that defendants dispute. (Pl. 56.1 ¶ 97; Def. 56.1 Resp. ¶ 97.)

Drawing every reasonable inference in favor of Trower as the non-movant, she has not come forward with evidence that could permit a reasonable trier of fact to find in her favor on a hostile work environment claim. The comments and behavior attributed to Guzman were racially neutral. "It is axiomatic that the plaintiff also must show that the hostile conduct occurred because of a protected characteristic." Tolbert, 790 F.3d at 439.

While Sullivan's use of the phrase "beautiful niggra" related directly to Trower's race, it was uttered in the context of discussions about Trower's dealings with a patient who spoke the phrase. As Trower correctly points out, the use of a racial epithet is relevant evidence of a hostile work environment, and can "quickly alter the conditions of employment" into one of a hostile environment. Rivera, 743 F.3d at 24. But the phrase's use here related directly to an incident involving a patient who used the term. Drawing every reasonable inference in Trower's favor, the Court accepts that the phrase made her uncomfortable and embarrassed, and might even have been uttered in a belittling fashion. Even so, the term's use in this context does not rise to a level that would permit a reasonable finder of fact to find a hostile work environment. Its use was not so pervasive or systematic as to alter the terms of Trower's employment. Tolbert, 790 F.3d at 439. Similarly, assuming the truth of Trower's assertion that Jones-Winter claimed to have taken "a white, red-headed, troll-looking bitch's job," such a remark, while offensive, was not part of a systematic or pervasive environment, and was not made in reference to Trower or her protected status.

By contrast, in Rivera, the record included testimony that plaintiff was directly addressed with a highly inflammatory epithet by co-workers and supervisors, threatened with

violence, told that African Americans should die and told to "get over it" when he complained about racial harassment. 743 F.3d at 23.

To the extent that Trower also raises a hostile work environment claim under the NYCHRL, summary judgment is also granted to the defendants. The NYCHRL does not create separate standards for claims directed to discrimination and a hostile work environment, and only requires that a plaintiff show that she was treated "less well" than other employees because of a protected trait. See, e.g., Duarte v. St. Barnabas Hosp., 265 F. Supp. 3d 325, 346-47 (S.D.N.Y. 2017) (Gardephe, J.) (collecting cases). For the reasons explained, Trower has not come forward with evidence sufficient to permit a reasonable trier of fact to conclude that she was treated less well on the basis of race.

Defendants' summary judgment motion is therefore granted as to Trower's hostile work environment claim.

III. **Defendants' Summary Judgment Motion Is Denied as to Trower's Claims of Discrimination Based on Disability.**

A. **Trower Has Come Forward with Some Evidence that She Was Terminated on the Basis of Disability.**

Trower alleges that the Hospital terminated her on the basis of her disability, and therefore violated the ADA. (Compl't ¶¶ 61-64.) In moving for summary judgment, the Hospital argues that Trower cannot make out a prima facie case of discrimination because she cannot show that her termination was based on disability. The Court concludes that because the record contains some evidence that Trower's disability leave may have motivated her supervisors to terminate her, the Hospital's summary judgment motion is denied.

The ADA "prohibits discrimination against any 'qualified individual with a disability because of the disability of such individual in regard to,' inter alia, 'discharge of

employees.'" Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir. 2001) (quoting 42

U.S.C. § 12112(a)). An employment discrimination claim under the ADA is analyzed under the

McDonnell Douglas burden-shifting framework. To make out a prima facie case of

discrimination based on disability, a plaintiff must show that 1.) the employer was subject to the

ADA, 2.) the employee was disabled within the meaning of the ADA, 3.) the employee was

qualified to perform her job's essential functions, with or without a reasonable accommodation

and 4.) she suffered an adverse employment due to her disability. Id. Once a plaintiff has

established a prima facie case, the burden shifts to the employer to articulate a legitimate, non-

discriminatory reason for the adverse action. McBride v. BIC Consumer Prod. Mfg. Co., 583

F.3d 92, 96 (2d Cir. 2009). If the burden is satisfied, the plaintiff then must come forward with

evidence that the reasoning offered by the employer was pretextual. Id.

The Hospital asserts that Trower cannot meet the burden under McDonnell

Douglas because she cannot show a causal connection between the adverse employment action

and her disability. The summary judgment record includes evidence that Trower suffers from

depression and anxiety, which has symptoms that include a decreased appetite, nightmares, panic

attacks and nausea. (Pl. 56.1 ¶ 118; Def. 56.1 Resp. ¶ 118.) For the purposes of this motion,

defendants have not disputed that Trower is disabled within the meaning of the ADA.

As noted, Trower went on short-term disability leave in the summer of 2015, and

submitted doctor's notes with return-to-work dates of July 20, September 7 and October 5, 2015;

the Hospital granted all of Trower's requests for leave. (Def. 56.1 ¶¶ 38-40; Pl. 56.1 Resp. ¶¶

38-40.) When Trower did not return to work after October 5, Jones-Winter, the director of labor

relations, wrote to Tyrone Bell, an official in Trower's union, inquiring whether he knew about

Trower's status; Bell replied that he did not. (Def. 56.1 ¶¶ 41-43; Pl. 56.1 Resp. ¶¶ 41-43.)

Trower did not respond to Jones-Winter's e-mail of October 23, 2015 requesting medical documentation, and was then terminated on November 2. (Def. 56.1 ¶ 45; Pl. 56.1 Resp. ¶ 45.)

Jones-Winter then rescinded the termination after reviewing documents in the Hospital's labor relations department, which included doctors' notes extending Trower's leave to November 30, 2015 and March 7, 2016. (Def. 56.1 ¶¶ 48-50; Pl. 56.1 Resp. ¶¶ 48-50.)

According to the Hospital, Trower was terminated because Jones-Winter was unaware that Trower had submitted doctor's notes to extend her leave dates, and was not terminated on the basis of her disability. The Hospital points out that Trower's termination was immediately rescinded when Jones-Winter learned of the doctor's notes.

The hospital has articulated a legitimate, non-discriminatory rationale for Trower's termination, based on Jones-Winter's initial failure to locate documentation substantiating Trower's medical leave. The burden then falls on Trower to come forward with evidence showing that her termination was pretextual. McBride, 583 F.3d at 96.

In opposition, Trower points to communications involving Sullivan and Jones-Winter, in which they discussed a desire for Trower to be terminated while she was out on disability leave. On August 11, 2015, Jones-Winter e-mailed Sullivan stating that Trower had extended her leave to September 7, 2015. (Pl. 56.1 ¶ 128; Def. 56.1 Resp. ¶ 128.) Sullivan replied, "How long do I have to keep this position for her? We are extremely short staffed and this ongoing short term disability is impacting our patient through put." (Pl. 56.1 ¶ 128; Def. 56.1 Resp. ¶ 128; Schwartz Dec. Ex. C.) Jones-Winter replied, "Is she at termination point now? If so, let's write her up and move forward." (Schwartz Dec. Ex. C.) Sullivan replied, "Do we have enough to do so or will this be retracted and I'll have to rehire her?" (Id.) In her deposition, Sullivan testified that at the time Trower began her disability leave, there had been no

plan to terminate her, and that her questions to Jones-Winter went toward whether Trower's

disciplinary record warranted termination. (Schwartz Dec. Ex. C. at 91-92.)

Separately, in an e-mail dated on or about August 12, 2015, while Trower was on

disability leave, Jones-Winter wrote the following to Trower:

> [U]ltimately we need to determine what you want to do, Kanika.
> You are focusing you [sic] current leave situation on Vadesa, but
> keep in mind that you were already at a Final w/suspension for
> multiple performance issues before you went out on medical leave.
> On paper, you are not a strong employee, and I can't imagine how
> this could completely turnaround [sic] when you return from leave.

(Pl. 56.1 ¶ 127; Def. 56.1 Resp. ¶ 127; McEvoy Reply Dec. Ex. 4.)

In her deposition, Sullivan testified that she had input into Trower's termination,

and that because Trower was out on leave, Sullivan wanted the termination so that she could hire

someone else. Trower testified that she "needed the position. I needed a body to fill the

position." (Schwartz Dec. Ex. C at 87.) Counsel asked, "And since Ms. Trower was out on

leave, you needed to terminate her to hire somebody else?", to which Sullivan answered, "That's

correct." (Id. at 87-88.)

Viewing the summary judgment record as a whole, and drawing every reasonable

inference in favor of Trower as the non-movant, the Court concludes that a reasonable trier of

fact could conclude that Trower's disability motivated her termination. A trier of fact must walk

through the evidence related to the proffered non-discriminatory basis for Trower's termination,

which related to the perceived failure to submit appropriate documentation to substantiate her

leave, from evidence that Trower's managers and/or supervisors were separately motivated by

the effect, if any, that her disability leave was causing on the workplace. The e-mails of Sullivan

and Jones-Winter, when reviewed along with Sullivan's deposition testimony, are some evidence

that Trower's termination was motivated by the effects of her disability leave. A trier of fact

must decide the credibility of Sullivan's explanation that her e-mails with Jones-Winter related to Trower's disciplinary history and were not referring to her disability status.

The defendants' summary judgment motion as to Trower's ADA claim is therefore denied.

B.  Defendants' Motion for Summary Judgment as to Trower's Disability Discrimination Claim under the NYCHRL Is Denied as to Sullivan and the Hospital, but Granted as to Guzman.

Under the NYCHRL, an employee makes out a prima facie case of disability discrimination if she suffers from a statutorily defined disability, "and the disability caused the behavior for which the employee was terminated."  Jacobsen v. N.Y. City Health & Hosp. Corp., 22 N.Y.3d 824, 834 (2014).

For the reasons explained, the defendants' summary judgment motion is denied as to Trower's disability discrimination claim under the NYCHRL as to the Hospital and Sullivan. In opposition to the defendants' motion, Trower has come forward with some evidence that Sullivan may have been motivated to terminate Trower due to her disability and the complications caused by her taking disability leave.  As noted, in her deposition, Sullivan testified that she had some input into the decision to terminate Trower.  A trier of fact must weigh the evidence to determine whether Trower's termination was motivated by discrimination based on disability, or whether it was due to legitimate, non-discriminatory reasons.

The summary judgment motion is granted, however, as to defendant Guzman. Trower has pointed to no evidence that Guzman had input into the decision-making process that led to Trower's termination.  Further, while portions of the record go toward workplace tensions between Trower and Guzman, including comments and conduct that Trower asserts were racially discriminatory, the record does not include evidence that goes toward any discriminatory

comments or conduct by Guzman that related to Trower's disability. Defendants' summary judgment motion is therefore granted as to Trower's NYCHRL claim against Guzman.

Therefore, defendants' summary judgment motion is denied as to Trower's NYCHRL claim of disability discrimination against the Hospital and Sullivan, but granted as to Trower's claim against Guzman.

IV. Defendants' Summary Judgment Motion Is Granted as to Trower's Claim of Retaliation under Title VII, but Denied as to Her Retaliation Claim under the ADA and the NYCHRL.

Trower asserts that the Hospital retaliated against her under Title VII, the ADA, and the NYCHRL. (Compl't ¶¶ 58-60, 65-68, 72-74.) For the reasons that will be explained, the Court concludes that no reasonable trier of fact could find defendants liable for retaliation under Title VII, but that a trier of fact must decide her claims of retaliation under the ADA and the NYCHRL. Defendants' summary judgment motion is therefore granted in part and denied in part as to Trower's retaliation claims.

A. Defendants' Summary Judgment Motion Is Granted as to Trower's Claim of Title VII Retaliation.

To make out a prima facie case of retaliation under Title VII, a plaintiff must show "'(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'" Shultz v. Congregation Shearith Israel of City of New York, 867 F.3d 298, 309 (2d Cir. 2017) (quoting Littlejohn, 795 F.3d at 316). If the plaintiff establishes a prima facie case, the burden shifts to the employer, who must then articulate a legitimate, non-retaliatory reason for the adverse action. Kirkland v. Cablevision Sys., 760 F.3d 223, 225 (2d Cir. 2014). If the employer carries that burden, the burden shifts

back to the plaintiff to demonstrate by competent evidence that the legitimate reasons offered by the employer was pretextual.  Id.

A plaintiff must show that retaliation was a "but-for" cause that motivated the adverse employment action.  Vega v. Hempstead Union Free School Dist., 801 F.3d 72, 90 (2d Cir. 2015).  This does not require proof that retaliation was the employer's only motive, "'but only that the adverse action would not have occurred in the absence of the retaliatory motive.'"  Id. at 91 (quoting Zann Kwan v. Andalex Grp., LLC, 737 F.3d 834, 846 (2d Cir. 2013)).

A temporal proximity between the protected activity and the adverse employment action may support an inference of retaliatory purpose, but the proximity "'must be very close.'"  Abrams v. Dep't of Public Safety, 764 F.3d 244, 254 (2d Cir. 2014) (quoting Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (per curiam)).  There is "no bright line" for the outer limits of when "a temporal relationship is too attenuated to establish a causal relationship . . . ."  Id. (quotation marks omitted).  However, temporal proximity alone is not enough to establish retaliatory purpose, and "'a plaintiff must come forward with some evidence of pretext in order to raise a triable issue of fact.'"  Id. at 254-55.  Abrams concluded that, without more, a five-month window between the plaintiff's protected activity and the alleged retaliation was insufficient to make a showing of pretext.  Id.

Trower asserts that she engaged in protected activity that included an oral complaint to Sullivan in 2014 about Guzman's allegedly discriminatory treatment of her, and the filing of her EEOC charge on June 10, 2015.  In moving for summary judgment, defendants urge that no reasonable trier of fact could find a causal connection between Trower's protected activity and her termination.

In November 2014, Trower orally complained to Sullivan about her purported mistreatment by Guzman. (Pl. 56.1 ¶ 96; Def. 56.1 ¶ 96; Trower Dep. 47-48.) Trower testified in her deposition that she told Sullivan she was being mistreated by Guzman because she was an African American. (Trower Dep. 48.) According to Sullivan, however, Trower did not complain that she was being treated differently on the basis of race, and complained instead about Guzman's use of the phrase "young lady." (Sullivan Dep. 40.) Sullivan testified that she could only "vaguely recall" the meeting. (Sullivan Dep. 39.) According to Trower, Sullivan then responded that she knew Trower was a minority within her department, that she was a minority herself, and that Sullivan had taken "a white, red-headed, troll-looking bitch's job who trained her." (Trower Dep. 49.) Sullivan disputes that she made these comments. (Sullivan Reply Dec. ¶ 2.)

It is undisputed that Sullivan then spoke to Guzman about her treatment of Trower, and instructed her not to use the term "young lady." (Pl. 56.1 ¶ 98; Def. 56.1 Resp. ¶ 98.) Guzman responded that the term was cultural, and was how Guzman addressed people in her home country. (Pl. 56.1 ¶ 98; Def. 56.1 Resp. ¶ 98.) According to Trower, Guzman's treatment of her then became worse. (Pl. 56.1 ¶ 101.) However, the only evidence that Trower cites in support of this assertion is deposition testimony in which she confirmed the contents of her complaint. (Trower Dep. 53.)

According to Trower, sometime in the summer of 2015, Sullivan told Trower that she was always complaining, and asked her why everything was a complaint. (P. 56.1 ¶ 113.) In a reply declaration, Sullivan disputes that she made such comments. (Sullivan Reply Dec. ¶ 2.)

On June 10, 2015, Trower filed her charge of racial discrimination against the Hospital with the EEOC. (Pl. 56.1 ¶ 116; Def. 56.1 Resp. ¶ 116.) Trower asserts that in a June

12, 2015 meeting with Jones-Winter, she complained that Guzman was discriminating against her because of her race.  (Pl. 56.1 ¶ 117; Trower Dep. 183.)  Defendants assert that Trower did not mention discrimination.  (Def. 56.1 Resp. ¶ 117.)  Trower also asserts that when Jones-Winter learned about Trower's EEOC filing, Jones-Winter asked why Trower hadn't come to her first.  (Pl. 56.1 ¶ 137.)

It is undisputed that on October 8, 2015, an individual named Jeff Cohan e-mailed Trower's EEOC complaint to Sullivan, stating, "just to brighten your day," and that Sullivan wrote back, "Awww you shouldn't have."  (Pl. 56.1 ¶ 141; Def. 56.1 Resp. ¶ 141.)

In deciding the defendants' motion, the Court assumes as true the factual assertions made by Trower, including those disputed by the defendants.  Thus, the Court assumes that Sullivan uttered the comments that Trower attributed to her in November 2014 and in the summer of 2015, and that after filing an EEOC charge, Trower complained to Jones-Winter in June of 2015 about discrimination by Guzman.  Even assuming the truth of Trower's version of events, no reasonable trier of fact could find a causal connection between Trower's complaints of racial discrimination and her termination in November 2015.

First, the timing of Trower's complaints and the adverse employment action is attenuated.  Her oral complaints to Sullivan in November 2014 pre-date her termination by a year.  The filing of her EEOC charge in June 2015 pre-dated her termination by slightly less than five months.  In Abrams, the Second Circuit concluded that, without more, a five-month window between protected the activity and an adverse employment action was insufficient to show that the adverse action was made on pretextual grounds.  764 F.3d at 254-55.  Temporally, the October 8, 2015 e-mails between Cohan and Sullivan are closer in time to the adverse employment action, but that exchange shows little more than awareness of Trower's already-

existing complaint.  While the apparently lighthearted tone of the exchange may not have been appropriate, it does not raise an inference of retaliatory motivation on Sullivan's part.

Second, as has been discussed, during the time between Trower's June 2015 EEOC charge and her November 2015 termination, Trower went on disability leave.  The summary judgment record includes evidence that Trower was terminated as a result of issues related to her disability leave: defendants maintain that the termination was an innocent, immediately corrected error based on paperwork confusion, while Trower points to comments that she contends reflect a discriminatory motivation.  Aside from the existence of complaints that pre-date her termination by five to twelve months, the record does not contain evidence of protected activity in response to racial discrimination or retaliatory motivation that relates to Trower's termination.

Third, the disciplinary actions taken against Trower after her complaints are consistent with disciplinary measures that pre-dated her complaints.  Prior to complaining to Sullivan in November 2014 about her treatment by Guzman, Trower received three warnings and attended three documented conferences.  After complaining to Sullivan, Trower received two warnings and attended three documented conferences.  (Trower Dep. 54, 56, 58, 60, 69, 70, 82, 84, 87, 90, 114 & Exs. 5-8, 10-14, 16, 20.)  In Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001), the Second Circuit concluded that where the "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."  See also Alejandro v. New York City Dep't of Educ., 2017 WL 1215756, at *23 (S.D.N.Y. Mar. 31, 2017) ("[W]hen – as here – a retaliation claim is predicated principally upon timing, adverse employment actions that were both part, and the ultimate product, of an extensive period of progressive discipline which began . . . months prior to the

employee's protected activities, a reasonable inference of retaliation cannot be drawn.")
(quotation marks omitted) (Nathan, J.). The Hospital's ongoing disciplinary measures, which
pre-dated Trower's complaints, are inconsistent with a retaliatory motive.

Fourth, certain of the facts raised by Trower in her opposition memo are
conclusory, speculative and lack support in the record. To defeat a motion for summary
judgment, "[a]n opposing party's facts must be material and of a substantial nature, not fanciful,
frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely
suspicions." Contemporary Mission, Inc. v. U.S. Postal Serv., 648 F.2d 97, 107 n.14 (2d Cir.
1981). Trower's opposition memorandum states, without support, that Sullivan and Jones-
Winter exchanged e-mails about ways to terminate Trower "[a]s soon as [she] made her
Complaint to the EEOC . . . ." (Opp. Mem. at 13.) Trower also asserts that her inability to log in
to the Hospital's internal job-placement system was a retaliatory action taken in response to her
complaints of discrimination. (Id.) Because these assertions are not supported by the summary
judgment record, the do not defeat defendants' motion for summary judgment.

Because no reasonable trier of fact could find that Trower's termination was
based on a retaliatory motivation, defendants' motion for summary judgment on Trower's claim
of Title VII retaliation is therefore granted.

B.   Defendants' Summary Judgment Motion Is Denied as to Trower's Claims of
     Retaliation under the ADA and the NYCHRL.

"Claims for retaliation under the ADA are analyzed under the same burden-
shifting framework established for Title VII cases." Widomski v. State Univ. of New York
(SUNY) at Orange, 748 F.3d 471, 476 (2d Cir. 2014) (quotation marks and alteration omitted).
An employee's request for a reasonable accommodation is protected activity under the ADA.
Weixel v. Bd. of Educ of City of N.Y., 287 F.3d 138, 149 (2d Cir. 2002). "[A] reasonable

accommodation includes requests for leave due to a plaintiff's disability." Clark v. Jewish Childcare Ass'n, Inc., 96 F. Supp. 3d 237, 262 (S.D.N.Y. 2015) (Karas, J.).

The NYCHRL makes it unlawful to "retaliate or discriminate in any manner against any person because such person has . . . opposed any practice forbidden under this chapter." N.Y.C. Admin. Code § 8–107(7). "Thus, to prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." Mihalik, 715 F.3d at 112 (internal citations omitted). An employee's opposition can include situations where she expressed disapproval of discriminatory conduct, and the employer's retaliatory response can be actionable if it was reasonably likely to deter a person from engaging in the protected activity. Id. at 112 (collecting cases). The totality of circumstances must be considered, and "even a single comment may be actionable in the proper context." Id. at 113.

As has been discussed, the summary judgment record includes e-mails between Sullivan and Jones-Winter discussing the inconveniences caused by Trower's disability leave, and Sullivan's desire to terminate Trower. Sullivan testified that she had not considered terminating Trower prior to her taking disability leave.

Additionally, on August 21, 2015, Trower filed an amended charge of discrimination with the EEOC, which asserted that she had been discriminated against on the basis of disability. (Pl. 56.1 ¶ 116; Def. 56.1 Resp. ¶ 116.) The temporal nexus between the amended charge of discrimination and Trower's termination is slightly more than two months, which is significantly closer than the protected activity related to Trower's claims of racial discrimination. Moreover, as just discussed, there is some evidence in the record that a trier of

fact could construe as reflecting a desire to see Trower terminated based on her use of disability leave.

Construing the record in the light most favorable to Trower as the non-movant, there is evidence that could lead a reasonable trier of fact to conclude that Trower's termination was motivated in part by retaliation against her for complaining of disability discrimination. Trower's EEOC charge asserting disability discrimination was filed ten days after Sullivan and Jones-Winter exchanged e-mails about terminating Trower, including Jones-Winter's suggestion to "write her up and move forward" and Sullivan's reply, "Do we have enough to do so or will this be retracted and I'll have to rehire her?" (Schwartz Dec. Ex. C.) Construing the record in the light most favorable to Trower as non-movant, a reasonable trier of fact could weigh the evidence and conclude that retaliatory motives were a "but-for" cause of the adverse employment action. A trier of fact needs to weigh the witnesses' explanations of the e-mails, draw any resulting inferences and decide whether the proffered reasons for Trower's termination were pretextual.

However, to the extent that Trower brings retaliation claims under the NYCHRL against Guzman, defendants' summary judgment motion is granted. Trower has not pointed to any evidence that Guzman played a role in the decision making process related to Trower's termination, or that she expressed any retaliatory motivation related to Trower's complaints.

Because the record does not establish as a matter of law that Trower was terminated for the proffered non-retaliatory reasons, the defendants' motion for summary judgment is denied as to Trower's claim of retaliation under the ADA, and her claim under the NYCHRL related to protected activity concerning her disability. Summary judgment is granted, however, as to the NYCHRL retaliation claim against Guzman.

V.    Defendants' Summary Judgment Motion Is Granted as to Trower's Aiding and
       Abetting Claim under the NYCHRL.

Trower asserts that Guzman and Sullivan violated the NYCHRL by aiding and

abetting acts of discrimination.  Under the NYCHRL, it is unlawful "for any person to aid, abet,

incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to

do so."  Admin. Code N.Y.C. § 8–107(6).  An individual may not be liable for aiding and

abetting in her own discriminatory conduct, but only for assisting another party in violating the

law.  Malena v. Victoria's Secret Direct, LLC, 886 F. Supp. 2d 349, 367-68 (S.D.N.Y. 2012)

(Oetken, J.).  An aiding and abetting claim is viable only where an underlying violation has taken

place.  Kellman v. Metro. Transp. Auth., 8 F. Supp. 3d 351, 393 (S.D.N.Y. 2014) (Batts, J.).

The remaining NYCHRL claims allege that Sullivan and the Hospital

discriminated against Trower on grounds of disability, and that Sullivan and the Hospital

retaliated against her for filing an EEOC charge complaining of disability discrimination on

August 21, 2015.  Trower has not pointed to evidence that Guzman participated in the alleged

disability discrimination or retaliated against Trower's protected activity related to the EEOC

charge.  As to Sullivan, Trower's opposition to defendants' motion relies heavily on Sullivan's

statements related to disability leave.  Sullivan cannot be liable for aiding and abetting her own

allegedly discriminatory conduct.  Malena, 886 F. Supp. 2d at 367-68.

Because no reasonable trier of fact could find Sullivan or Guzman liable for

aiding and abetting the remaining NYCHRL claims, defendants' summary judgment motion is

granted as to the aiding and abetting claim.

CONCLUSION.

 Defendants' motion for summary judgment is granted in part and denied in part.

The Clerk is directed to terminate the motion.  (Docket # 37.)  The surviving claims in this action

assert disability discrimination and retaliation for complaining of disability discrimination under the ADA against Mount Sinai, and disability discrimination and retaliation under the NYCHRL against Mount Sinai and Sullivan.

There will be a pretrial conference on September 21, 2018 at 12:30 p.m.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
September 6, 2018